IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| RUSSELL L. EBERSOLE, d/b/a ABERDEEN ACRES PET CARE CENTER,<br><br>    Plaintiff,<br><br>        v.<br><br>BRIDGET KLINE-PERRY,<br><br>    Defendant. | )<br>)<br>)<br>)<br>)<br>)   1:12cv26 (JCC/TRJ)<br>)<br>)<br>)<br>)<br>) |

**M E M O R A N D U M   O P I N I O N**

This matter is before the Court on Defendant Bridget
Kline-Perry ("Defendant" or "Kline-Perry")'s Motion for New
Trial or, in the Alternative, to Alter the Judgment[1] [Dkt. 90]
and Plaintiff Russell L. Ebersole, d/b/a Aberdeen Acre Pet Care
Center ("Plaintiff" or "Ebersole")'s Motion for Attorneys' Fees
and Costs [Dkt. 88].  For the following reasons, Defendant's
Motion for New Trial or, in the Alternative, to Alter the
Judgment is denied insofar as it seeks to set aside the jury's
award of punitive damages or a reduction of that award as a
matter of law.  Defendant's motion is denied conditionally
insofar as it seeks a new trial, dependent on Plaintiff's
acceptance of a remitted award of punitive damages.  The Court

---

[1] As explained below, the Court construes Defendants' motion as including an
alternative request for remittitur.

1

will defer ruling on Plaintiff's Motion for Attorneys' Fees and
Costs pending his decision on remittitur.

### I. Background

       This case involves allegedly libelous statements made
by Kline-Perry about Ebersole and his pet care business,
Aberdeen Acres Pet Care Center.  Kline-Perry also allegedly
engaged in a conspiracy to harm Ebersole's business.  Kline-
Perry is a breeder of horses, who owns a horse-breeding farm
called Norsire Farms.  In April 2009, Kline-Perry sold a German
Shepherd puppy named "Zeus" to Georgie and Bill Straub,
customers of Aberdeen Acres.  The following month, Kline-Perry
went to Aberdeen Acres to watch Zeus being trained, at which
point, according to her testimony, she observed Zeus in a choke
collar and witnessed Ebersole stomp on the puppy's paw.

       In November 2011, stories were published in local
newspapers and broadcasted on local television regarding an
investigation of Ebersole arising from alleged acts of animal
abuse at Aberdeen Acres.  Kline-Perry then made a number of
statements in which she accused Ebersole of animal abuse and
violating laws pertaining to dog training.  These statements
were published in various e-mails and Facebook postings.  For
example, Kline-Perry posted to her Norsire Farms Facebook page a
letter composed by her and her friend, Charlie Oren, accusing
Ebersole of animal abuse and fraudulent acts, and asked others

to share it.  Kline-Perry also sent a letter to People for the Ethical Treatment of Animals ("PETA"), asking the organization to stage a protest regarding Ebersole and Aberdeen Acres due to the alleged instances of animal abuse.

On December 13, 2011, Ebersole, proceeding *pro se*, filed suit in Loudon County Circuit Court.  [Dkt. 1.]   On January 9, 2012, Defendants timely removed the action to this Court on the basis of diversity jurisdiction.  [*Id.*]  Ebersole subsequently retained counsel [Dkt. 14] and filed an amended complaint on March 23, 2012 [Dkt. 31].  In the amended complaint, Ebersole alleged libel, business conspiracy in violation of Va. Code § 18.2-499, and tortious interference with a business expectancy.

On July 23, a jury trial commenced.  After the close of Plaintiff's evidence, Defendant moved for judgment as a matter of law pursuant to Federal Rule of Civil Procedure 50 with respect to the business conspiracy and tortious interference claims as well as a portion of the libel claim. The Court granted Defendant's Rule 50 motion as to the tortious interference claim.  The Court also granted Defendant's Rule 50 Motion as to certain of Kline-Perry's allegedly libelous statements.  The business conspiracy claim and the libel claim (as to the remaining allegedly libelous statements) were

ultimately submitted to the jury. The statements submitted to the jury on the libel claim were as follows:

(1) In an e-mail of November 25, 2011, to "Charlie":

(a) "You need to click on the link I put on you [sic] page and have a read about people leaving dogs and coming back to find they were dead and the bodies were 'disposed' of before they got their [sic] to pick up their dog, dogs being drop kicked across a room, dogs being shocked on the highest shock until they passed out with blood running out of their mouths and eyes or died, employees getting their cell phones taken from them and smashed with [sic] they tried to take pictures of Russ beating the dogs, dogs being chocked [sic] and swung over his head like a helicopter . . . this is on tape with the drug people in DC on cam, dogs being shocked until they screamed in pain and crawled on their belly to Russ to try to please him and the [sic] would call them and pet them as he shocked the shit out of them."

(b) "He will get more time for the fraud of training handicap dogs for non handicap people, because it is a felony fraud of the public than he will for the abuse!"

(2) In an e-mail of November 26, 2011, to Bill Straub:

(a) "[W]hen you see Zeus being abused on tape would the [sic] convince you?"

(3) In an e-mail of November 28, 2011, to employees of PETA:

(a) "He has choked dogs to the point they pass out with blood running out of their mouths and eyes . . . documented by Vets and the staff has tried for years to report it, but he would intimidate them and/or destroy their cell phones."

4

(4) In an e-mail of November 27, 2011, to employees of PETA:

    (a) "[T]he man is still running the kennel and he should be arrested and in jail for the numberous [sic] dogs that have died at his hands just his [sic] summer alone and they are not doing anything about it."

    (b) "He is also training dogs for the handicap of which [it] is illegal and a felony for handicap people and he is not certified to train a knat [sic]!"

(5) In a letter of November 28, 2011:

    (a) "People have had their dogs die and some injured."

    (b) "Another lady went to pick up her boarded dog only to find that the dog died and was lied to about the cause. She wasn't even able to retrieve his body."

    (c) "There is a saved email about a dog being trained as a Service Dog and the owner's [sic] have no disability. The email states, 'Russ told them it was against the law for anyone to ask them if they were disabled.'"

    (d) "Training a Service Dog by an uncertified trainer could be another scam, a felony. How many people have believed in him and paid much money for a Service Dog for a child that can't perform?"

    (e) "Does it take the death of a child to wake everyone up when a Service Dog is not properly trained."

    (f) "Now, he is allegedly getting away with abusing people's beloved pets and most likely defrauding the public with his Service Dog operation."

On July 25, 2012, the jury returned a verdict in favor of Plaintiff. The jury awarded Plaintiff $7,500 in compensatory

damages on his libel claim, $7,500 in compensatory damages on his business conspiracy claim, and $60,000 in punitive damages.

On August 6, 2012, Plaintiff filed his Motion for Attorneys' Fees and Costs [Dkt. 88] and Defendant filed her Motion for New Trial or, in the Alternative, to Alter the Judgment [Dkt. 90].  The parties filed their respective oppositions on August 13, 2012, [Dkts. 99-100].  Plaintiff filed his reply on August 15, 2012, [Dkt. 101], while Defendant filed her reply on August 16, 2012, [Dkt. 102].

The parties' motions are before the Court.

## II.  Standard of Review

### A.   Motion for New Trial

Under Federal Rule of Civil Procedure 59(a), a new trial may be granted in an action in which there has been a trial by jury "for any of reason for which a new trial has heretofore been granted in actions at law in federal court." Fed. R. Civ. P. 59(a).  "On a Rule 59(a) motion, a district court may set aside the jury's verdict and grant a new trial only if '(1) the verdict is against the clear weight of the evidence, or (2) is based upon evidence which is false, or (3) will result in a miscarriage of justice even though there may be substantial evidence which would prevent the direction of a verdict.'"  *Attard Indus., Inc. v. U.S. Fire Ins. Co.*, No. 1:10cv121, 2010 WL 4670704, at *2 (E.D. Va. Nov. 9, 2010)

(quoting *Atlas Food Sys. & Servs. Inc. v. Crane Nat'l Vendors, Inc.*, 99 F.3d 587, 594 (4th Cir. 1996)).  In considering a Rule 59 motion, "courts may make credibility judgments in determining the clear weight of the evidence." *Id.* (citing *Knussman v. Maryland*, 272 F.3d 625, 647 (4th Cir. 2001)).  "The grant or denial of a motion for new trial is entrusted to the sound discretion of the district court and will be reversed on appeal only upon a showing of abuse of discretion." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 305 (4th Cir. 1998).

B.   <u>Alternative Motion to Alter the Judgment</u>

Defendant's alternative Motion to Amend the Judgment pertains to the jury's award of punitive damages.  Defendant requests that the award be set aside or, at a minimum, reduced. Courts have occasionally reduced verdicts in this manner when "it is apparent as a matter of law that certain identifiable sums included in the verdict should not have been there." *Liberty Mut. Fire Ins. Co. v. J.T. Walker Industries, Inc.*, No. 2:08-2043-MBS, 2012 WL 3292973, at *13 (D.S.C. Aug. 10, 2012) (quotation omitted) (citing *Westchester Fire Ins. Co. v. Hanley*, 284 F.2d 409 (6th Cir. 1960)).  "However, courts have more often found such a practice to infringe the Seventh Amendment right to trial by jury." *Id.* (citing *Brewer v. Uniroyal, Inc.*, 498 F.2d 973, 976 (6th Cir. 1974)).

When faced with a verdict the court deems excessive, the general practice is to order a remittitur. *See Cline*, 144 F.3d at 305 n.2 ("[F]or purposes of avoiding conflict with the Seventh Amendment, the preferable course, upon identifying a jury's award as excessive, is to grant a new trial nisi remittitur . . . ."). Remittitur, which is used in connection with Rule 59(a), is a process by which the "court orders a new trial unless the plaintiff accepts a reduction in an excessive jury award." *Id.* at 305. While "[t]here is no specific provision for remittitur under the Federal Rules of Civil Procedure, [] it is well established that a remittitur should be ordered when a jury award will result in a miscarriage of justice." *Bennett v. Fairfax Cnty.*, 432 F. Supp. 2d 596, 599 (E.D. Va. 2006) (citing *Cline*, 144 F.3d at 305). Accordingly, the Court construes Defendant's motion as including a request for remittitur. *See Liberty Mutual*, 2012 WL 3292973, at *13.

### III. Analysis

#### A.   Unfair Prejudice and Surprise

Defendant argues that she is entitled to a new trial because the Court erred in admitting seven videos, which depicted Plaintiff training various dogs without any incident of animal abuse. Defendant asserts that five of those videos were not produced during discovery, and two were produced as proposed exhibits when Plaintiff filed his exhibit list on May 21, 2012.

The Court excluded the videos during Plaintiff's case-in-chief for not being timely produced.  During Defendant's case-in-chief, however, several witnesses testified as to specific acts of animal abuse by Plaintiff.  Thereafter, Plaintiff was allowed to introduce the seven videos in rebuttal, as they were relevant for impeachment purposes.[2]  Defendant claims that she was unfairly prejudiced and surprised by the admission of these videos, and that a new trial is therefore warranted.

Federal Rule of Civil Procedure 26 generally does not require pre-trial disclosure of evidence that may be offered at trial solely for impeachment.  *Alphonso v. Esfeller Oil Field Const., Inc.*, 380 F. App'x 808, 810 (11th Cir. 2010) (unpublished).  There is an exception, however, in that a party must disclose impeachment evidence in response to a specific discovery request.  *Newsome v. Penske Truck Leasing Corp.*, 437 F. Supp. 2d 431, 436 (D. Md. 2006).  The Court allowed Plaintiff to introduce the videos in rebuttal based on the representation by Plaintiff's counsel that Defendant had not requested them. Defendant now points out that in her document requests, which were served on Plaintiff on March 27, 2012, she requested "[c]omplete copies of all customer boarding and/or training

---

[2] In her reply brief, Defendant points out that two of her witnesses were excluded on the basis of untimely disclosure, and proceeds to argue that "what is good for the goose should be good for the gander." (Def.'s Reply [Dkt. 102] 6.)  However, Defendant omits that these witnesses were "precluded from testifying *except for impeachment purposes*." (Mem. Op. [Dkt. 68] 10, 12 (emphasis added).)  Thus, the Court's evidentiary rulings were entirely consistent with respect to both parties.

files including, but not limited to, intake forms, pet medical instruction forms, pet medical waivers, contracts, agreements and other documents pertaining to the services provided." (Def.'s Mem. in Supp. of R. 59 Mot. ("Def.'s Mem.") [Dkt. 91] 9.)

This document request is broad enough that it could certainly be construed as encompassing the videos at issue. However, the context of the case reveals that if Plaintiff did not construe the request accordingly, he was not entirely unreasonable in doing so.  The evidence at trial revealed that Plaintiff uploaded dog-training videos to YouTube and Facebook to share with the dogs' owners as well as the public.  As such, they appear to have been a tool designed primarily for marketing and customer relationships rather than a form of recordkeeping -- the latter being more akin to the documents described in Defendant's document request.  Plaintiff also represents that after uploading the videos to YouTube and Facebook, he simply kept electronic backup files on his laptop computer, rather than storing physical copies in "training files."[3]  As such, it is plausible that Plaintiff genuinely did not understand the videos at issue as falling within Defendant's document request.

---

[3] Illustrative of the unique facts of this case, Plaintiff further states that his laptop computer was seized by local police pursuant to a search warrant executed in November 2011, and that the computer has not been returned to him.  Thus, it also appears that these backup files were not in Plaintiff's possession during discovery, further demonstrating that his failure to produce them was not in bad faith.

It is also apparent that Defendant was aware that such videos existed during discovery.  In his opposition, Plaintiff includes excerpts from a number of e-mails produced in discovery (some by Defendant), which reference the videos and, in certain instances, even provide corresponding links to Facebook.  (Pl.'s Opp'n [Dkt. 97] 9-12.)  Defendant could, then, have more specifically phrased her document request and asked for copies of the videos outright.  She also could have conferred with Plaintiff's counsel if dissatisfied with Plaintiff's response to the document request at issue.[4]

Lastly, even construing Plaintiff's response to the discovery request as error, the admission of the videos was not sufficiently prejudicial to constitute a miscarriage of justice, and hence does not warrant a new trial.[5]  Apart from Defendant's awareness of dog-training videos during discovery, Defendant was provided with a number of links to pictures and videos uploaded to YouTube and Facebook when Plaintiff updated his Rule 26(a)

---

[4] It bears mentioning that the trial in this case was replete with objections by both sides involving discovery issues that could and should have been resolved by the parties well ahead of time.

[5] Defendant does not specify which of the Rule 59(a) grounds she believes entitles her to a new trial.  Given that Defendant did not file a renewed motion for judgment as a matter of law pursuant to Rule 50(b), the Court assumes that she primarily rests her argument on the "miscarriage of justice" ground.  Defendant does suggest that the videos may have been improperly edited, or that Plaintiff may have lied about the date and time that they were filmed -- thereby positing that false evidence may have been presented to the jury.  Defendant has not, however, affirmatively demonstrated this to be the case.  It is also worth pointing out that Defendant questioned one of her own witnesses about the circumstances under which the dog-training videos were filmed, was able to cross-examine Plaintiff regarding the same, and raised the issue in closing argument.  The issue was, then, effectively presented to the jury.

disclosures near the end of discovery.[6]   As Defendant points out, only two of the seven videos admitted were available through these links.  However, all seven videos were of the same general character and introduced by Plaintiff for the same purpose -- namely, to rebut the testimony of Defendant's witnesses regarding animal abuse.  As such, Defendant's claim that she was surprised and prejudiced by the admission of the undisclosed videos is somewhat overstated.  In short, the admission of the videos was not so prejudicial as to entitle Defendant to a new trial.

### B.   Lack of Foundation and Speculation

Defendant also argues that she is entitled to a new trial because evidence as to the number of "likes" appearing on Defendant's Facebook page was admitted without proper foundation.  According to Plaintiff's evidence, a "like" is recorded whenever a Facebook user clicks the "like" button corresponding to another user's Facebook page or posting.  This copies the "liked" page or posting to the Facebook page of the user who clicked the "like button."

Evidence adduced at trial indicated that Defendant's Facebook page for Norsire Farms had in excess of 5,000 "likes."

---

[6] Again, because Plaintiff was without possession of his laptop computer, it appears the only means of obtaining the videos was through these links. Plaintiff also represents that he provided Defendant with copies of these files after downloading them himself.

Defendant contends that this evidence was admitted without proper foundation.  Specifically, Defendant argues that there was no offered as to when these "likes" occurred, or whether any of them occurred during or after the four-day period in November 2011 when Defendant made the statements at issue.  According to Defendant, there was no evidence from which the jury could conclude that any of the "likes" resulted in others reading these statements, and thus resulted in pure speculation.

    The Court disagrees.  The number of "likes" on Defendant's Norsire Farms Facebook page is indicative of its popularity.  The greater the number of "likes" on the page, the more likely it is that others visited the page and viewed whatever Defendant posted there, including the aforementioned letter.  The evidence was therefore relevant as to how widely disseminated the letter was, a fact that was of consequence to the publication element of Plaintiff's libel claim.  *See* Fed. R. Evid. 401 ("Evidence is relevant if it has any tendency to make a fact more or less probable than it would be without the evidence and the fact is of consequence in determining the action.").  The evidence was also, generally speaking, germane as to Defendant's intent in posting the letter -- namely to reach a large audience.  Indeed, Defendant testified as much at

13

trial.  Accordingly, the Court did not err in admitting the number of "likes" on Defendant's Norsire Farms Facebook page.[7]

C.   Punitive Damages

Lastly, Defendant argues that the jury's punitive damages award of $60,000 was so excessive as to violate her rights under the Due Process Clause.  It is axiomatic that "the Constitution imposes a substantive limit on the size of punitive damages awards."  *Honda Motor Co., Ltd. v. Oberg*, 512 U.S. 415, 420 (1994).  The Supreme Court has articulated three guideposts for courts to consider when determining whether a jury's award of punitive damages violates due process: "(1) the degree of reprehensibility of the defendant's misconduct; (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive damages award; and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized or imposed in comparable cases."  *State Farm Mut. Auto. Ins. Co. v. Campbell*, 538 U.S. 408, 418 (2003).  Together, these guideposts ensure that defendants have fair notice about the severity of the penalty they may face for engaging in prohibited conduct.  *BMW of N. Am., Inc. v. Gore*,

---

[7] Defendant also points out that Plaintiff's counsel, in closing argument, argued that the jury should consider the number of "likes" on Defendant's Norsire Farms Facebook page in determining punitive damages.  Specifically, Plaintiff's counsel suggested that the jury assign a value of $20 to each "like."  Whether this suggestion by Plaintiff's counsel called for speculation, and whether the jury's award of punitive damages is unconstitutionally excessive, are questions separate and distinct from whether evidence of the number of "likes" was admissible for any purpose at all.  The Court will therefore address the former issues separately.

517 U.S. 559, 574 (1996).  The Court will consider each
guidepost in turn.

"[T]he most important indicium of the reasonableness
of a punitive damages award is the degree of reprehensibility of
the defendant's conduct." *Gore*, 517 U.S. at 575.  Courts are
instructed to determine the reprehensibility of a defendant's
acts by considering whether: (1) the harm caused was physical as
opposed to economic; (2) the tortious conduct evinced an
indifference to or a reckless disregard of the health or safety
of others; (3) the target of the conduct had financial
vulnerability; (4) the conduct involved repeated actions or was
an isolated incident; and (5) the harm was the result of
intentional malice, trickery, or deceit, or mere accident.
*State Farm*, 538 U.S. at 419.  "The existence of any one of these
factors weighing in favor of a plaintiff may not be sufficient
to sustain a punitive damages award; and the absence of all of
them renders any award suspect."  *Id.*

Evaluating these factors, Defendant's conduct involved
economic harm rather than physical harm, and did not evince an
indifference or reckless disregard for the health or safety of
others.[8]   Plaintiff testified at trial that he was in the midst

---

[8] With regard to the latter point, Plaintiff argues that Defendant sought to
have him prosecuted for conduct which the evidence at trial demonstrated to
be legal -- namely training dogs without certification.  However, the
evidence merely demonstrated that Defendant sought to have authorities
*investigate* Plaintiff (including for animal abuse, which is decidedly
*ill*egal).  It also bears mentioning that Plaintiff was, in fact, under

of a Chapter 11 bankruptcy at the time the allegedly libelous statements were published.  He was, therefore, financially vulnerable, and thus this case does involve the third factor.

The fourth factor is whether the conduct involved repeated actions or was an isolated incident.  The allegedly libelous statements submitted to the jury were limited to a four-day period, and hence were not made over an extended period of time.[9]  There was also no evidence that Defendant had ever engaged in similar conduct with respect to any other person. *See Bridgeport Music, Inc. v. Justin Combs Publ'g*, 507 F.3d 470, 487 (6th Cir. 2007) (stating that "[t]he repeated conduct factor requires that the similar reprehensible conduct be committed against various different parties rather than repeated reprehensible acts within the single transaction with the plaintiff.") (internal quotation marks and alteration omitted). That the conduct at issue constitutes an isolated incident is "a consideration that other courts have found highly persuasive when considering whether a punitive damages award violates due process." *Wallace v. Poulos*, --- F. Supp. 2d ----, 2012 WL 993380, at *13 (D. Md. Mar. 22, 2012) (citations omitted).

---

investigation for animal abuse at the time the allegedly libelous statements were made, as disclosed in local news stories.
[9] Other statements and acts outside this time period were admitted into evidence, as they were relevant to Plaintiff's business conspiracy claim. However, Plaintiff did not request, and this Court did not give, a jury instruction authorizing punitive damages for that claim.  *See Wallace v. Poulos*, --- F. Supp. 2d ----, 2012 WL 993380, at *12 (limiting the facts to those integral to the claims supporting the award of punitive damages is "the more reasoned choice").

Finally, in awarding punitive damages, the jury found by clear and convincing evidence that Defendant published the allegedly libelous statements with actual malice. Defendant does not seek to overturn the award of punitive damages on the ground that insufficient evidence existed for the jury to reach this finding, but rather challenges the award as unconstitutionally excessive. That said, Defendant testified, and credibly so, that her actions were motivated by a desire to protect the animals in Plaintiff's care rather than to harm or injure Plaintiff. *See Attard Indus.*, 2010 WL 4670704, at *2 (noting that a court "may make credibility judgments" in evaluating a Rule 59 motion); *see also Cooper Indus. Inc. v. Leatherman Tool Grp., Inc.*, 532 U.S. 424, 440 (2001) (noting that district courts have a "somewhat superior vantage over courts of appeals" with respect to the reprehensibility inquiry, primarily due to "issues turning on witness credibility and demeanor.") Indeed, Defendant made the statements at issue following stories in the local news media reporting allegations of animal abuse by Plaintiff.[10] Defendant had previously observed Plaintiff engage in training methods of which she disapproved, and the news stories prompted her to take action. This evidence undercuts the notion that Defendant's conduct was

---

[10] Defendant presented other witnesses, including former employees of Plaintiff, who also credibly testified that Plaintiff indeed engaged in acts of animal abuse.

purely malicious, and the Court will adjust the fifth factor accordingly.

In sum, Defendant's conduct was not extraordinarily reprehensible, but was sufficiently blameworthy that the jury was justified in awarding punitive damages. As noted above, Plaintiff was financially vulnerable at the time of the alleged libel. Moreover, Defendant accused Plaintiff of violating the law by training dogs without certification, which the evidence at trial revealed to be legal. However, given that three of the factors weigh against a finding of reprehensibility, there appears to be a disconnect between Defendant's conduct and the punitive damages awarded, which suggests that a reduction of the award could well be appropriate.[11]

"The second and perhaps most commonly cited indicium of an unreasonable or excessive punitive damages award is its ratio to the actual [or potential] harm inflicted on the plaintiff." *Gore*, 517 U.S. at 580. To satisfy this factor, the punitive damages must bear a reasonable relationship to the

---

[11] It is worth noting here that the only metric Plaintiff offered the jury for calculating punitive damages was his suggestion, during closing argument, that the jury award Plaintiff $20 for each of the 5,000 "likes" on Defendant's Norsire Farms Facebook page. While evidence of the "likes" was relevant, as discussed above, this suggestion by Plaintiff's counsel was ungrounded and arbitrary. The jury, meanwhile, was denied other potential metrics. For example, "a defendant's financial position is a proper consideration in assessing punitive damages." *See Haslip*, 499 U.S. at 22; *see also Gore*, 517 U.S. at 591 (Breyer, J., concurring) ("[A] fixed dollar award will punish a poor person more than a wealthy one, [so] one can understand the relevance of [the defendant's financial position] to the State's interest in retribution"). No evidence of Defendant's financial position was introduced at trial, however, impeding the jury's ability to calculate a punitive damages award with an appropriate retributive focus.

compensatory damages.  *Id.*  The Supreme Court has declined to adopt a bright line ratio which no punitive damages award can exceed, but has counseled that an award of punitive damages more than four times the amount of compensatory damages "might be close to the line of constitutional impropriety."  *State Farm*, 538 U.S. at 425 (citing *Pac. Mut. Life Ins. Co. v. Haslip*, 499 U.S. 1, 23-24 (1991)).

Here, Plaintiff recovered $7,500 in compensatory damages on his libel claim, and thus the ratio of punitive damages to compensatory damages is 8:1.  The $7,500 in compensatory damages Plaintiff recovered was substantial, given that Plaintiff's reputation was tarnished prior to Defendant's alleged libel.  Specifically, Plaintiff had previously been convicted of twenty-five felonies for wire fraud, and, as mentioned above, local news media had published stories regarding alleged animal abuse by Plaintiff just prior to Defendant's publication of the allegedly libelous statements. The latter point also raises a question as to whether the economic harm alleged by Plaintiff was caused by Plaintiff or external forces.  For these reasons, the 8:1 ratio of compensatory damages to punitive damages is constitutionally suspect.

The third and final guidepost is the disparity between the punitive damages award and the "civil penalties authorized

19

or imposed in comparable cases." *State Farm*, 538 U.S. at 428.

"[A] reviewing court engaged in determining whether an award of

punitive damages is excessive should 'accord "substantial

deference" to legislative judgments concerning appropriate

sanctions for the conduct at issue.'" *Gore*, 517 U.S. at 583

(quoting *Browning-Ferris Indus. of Vt., Inc. v. Kelco Disposal,

Inc.*, 492 U.S. 257, 282, 301 (1989) (O'Connor, J., concurring in

part and dissenting in part)).

      With regard to this factor, Defendant points out that

Virginia imposes a criminal penalty for slander and libel.  *See*

Va. Code § 18.2-417.  A criminal conviction under this statutory

provision is a class 3 misdemeanor, *id.*, and is punishable by a

maximum fine of $500, *id.* § 18.2-11(c).[12]  Given that Plaintiff's

libel claim was comprised of five allegedly libelous statements,

the maximum criminal penalty Defendant would face is $2,500.

The Supreme Court has cautioned that while the "existence of a

criminal penalty does have a bearing on the seriousness with

which a State views [a] wrongful action," such a penalty has

"less utility" when determining the dollar amount of the award.

*State Farm*, 538 U.S. at 418.  Thus, the presence of a $2,500

maximum criminal penalty does not mean that the Court should

automatically reduce punitive damages to that amount.  *See*

---

[12] Plaintiff's discussion of the criminal penalty for a business conspiracy
pursuant to Va. Code § 18.2-499, (*see* Pl.'s Opp'n 8 & n.6), is misguided, as,
again, pursuant to Plaintiff's proposed jury instructions, the jury was only
authorized to give punitive damages for libel.

*Cretella v. Kuzminski*, 640 F. Supp. 2d 741, 746-47 (E.D. Va. 2009) (granting remittitur as to punitive damages awards on four defamation claims, three of which were reduced to $5,000 (a 75% reduction), and one to $8,000 (also a 75% reduction)). That said, the fact that the jury's award of punitive damages is twenty-four times greater than the maximum criminal penalty Defendant would face for her conduct does indicate that the award is grossly excessive.

Evaluation of all three guideposts leads to the conclusion that the punitive damages award in this case violates Defendant's due process rights. The Court concludes that a 75% reduction to the jury's punitive damages award is appropriate. The resulting award of punitive damages is $15,000, and the resulting ratio to compensatory damages is 2:1. The Court finds that such an award comports with Defendant's conduct in this case, and satisfies the deterrence objective of punitive damages.

Having concluded that the jury's punitive damages award is unconstitutionally excessive, the question of remedy remains. After determining that a punitive damages award is unconstitutionally excessive, some courts have entered judgment for the maximum amount of constitutionally acceptable punitive damages. *See Wallace v. Poulos*, 2012 WL 993380, at *15. These courts have reasoned that a reduction in punitive damages to

comply with the Due Process Clause is a "federal constitutional issue," not a fact issue requiring jury consideration. *See Jones v. United Parcel Serv., Inc.*, 674 F.3d 1187, 1208 n.2 (10th Cir. 2012). While the Fourth Circuit has not squarely addressed this issue, it has stated that a new trial would be appropriate even where punitive damages are found to be unconstitutional. *See EEOC v. Fed. Express Corp.*, 513 F.3d 360, 376 (4th Cir. 2008) (citing *Cline*, 144 F.2d at 305) ("If a punitive damages award is unconstitutionally excessive, it is our obligation to order a remittitur or award a new trial."). In light of this language, the Court will not lower the jury's punitive damages award without offering Plaintiff the option of a new trial. *See Thomas v. iStar Fin., Inc.*, 652 F.3d 141, 146-47 (2d Cir. 2011) (noting that courts in the Second Circuit provide plaintiffs with the option of a new trial even where a punitive damages award has been held unconstitutionally excessive and that "the Constitution does not prohibit this cautious approach") (quoting *Johansen v. Combustion Eng'g, Inc.*, 170 F.3d 1320, 1332 (11th Cir. 1999))). Accordingly, the jury's punitive damages award is remitted to $15,000. Plaintiff shall have ten days to accept the remitted amount or request a new trial.

    D.    Attorneys' Fees

Given the Court's conclusion that a remittitur is warranted in this case, the Court will hold its decision on Plaintiff's Motion for Attorneys' Fees in abeyance, pending Plaintiff's decision on whether to accept the remitted award of punitive damages or request a new trial.

## IV.   Conclusion

For these reasons, Defendant's Motion for New Trial or, in the Alternative, to Alter the Judgment is denied insofar as it seeks to set aside the jury's award of punitive damages or, in the alternative, a reduction of that award as a matter of law.  Defendant's motion is denied conditionally insofar as it seeks a new trial, dependent on Plaintiff's acceptance of a remitted award of punitive damages.  The Court will defer ruling on Plaintiff's Motion for Attorneys' Fees and Costs pending his decision on remittitur.

An appropriate Order will issue.


|  |  |
|---|---|
|  | /s/ |
| August 29, 2012 | James C. Cacheris |
| Alexandria, Virginia | UNITED STATES DISTRICT COURT JUDGE |


23